**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

ASHLEY L. BANUELOS,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.
_______________________________/

Case No. 1:09-cv-00622-JLT

ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT

ORDER DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)

ORDER DIRECTING THE CLERK TO ENTER JUDGMENT FOR PLAINTIFF ASHLEY L. BANUELOS AND AGAINST DEFENDANT MICHAEL J. ASTRUE

## BACKGROUND

Plaintiff Ashley L. Banuelos ("Claimant" or "Plaintiff") seeks judicial review of an administrative decision denying her claim for supplemental security income benefits under Title XVI of the Social Security Act (the "Act").

## FACTS AND PRIOR PROCEEDINGS[1]

On February 19,1997, Plaintiff, then aged 11, filed an application for supplemental security income ("SSI") benefits under Title XVI of the Act. AR at 117. On September 24, 1998, Plaintiff was granted SSI benefits. Id. at 237. At that time, Plaintiff was determined to have the severe

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

impairments of recurring adhesive otitis media of the left ear with early cholesteatoma, a pyogenic granuloma in the right ear, and dwarfism causing marked limitations to her motor and social functioning. Id.

On November 6, 2003, shortly after her 18th birthday, the Social Security Administration ("agency") notified Plaintiff that her disability status would be reviewed under the rules for adults. Id. at 252. After initial denial of her request for benefits by the agency, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 296. In July 2006 the ALJ held a hearing, and on September 14, 2006, denied benefits. Id. at 16-22. Specifically, the ALJ found that Plaintiff was not disabled at step five of the five-step sequential evaluation. Id. at 22. The Appeals Council denied review on February 27, 2009. Id. at 8-10.

Hearing Testimony

At the hearing, Plaintiff testified that she was 20 years old, three feet, ten inches tall, and weighed 132 pounds. Id. at 548. She stated that she lived at home with her mother and two brothers. Id. at 552.

Plaintiff testified that she had a twelfth grade education and had received her diploma. AR at 552. She stated that while in high school, she received tutoring for math and English. Id. at 553. In addition, Plaintiff stated that she began two semesters of college, but did not complete either semester. Id. at 554. While attending college, she claimed that she received assistance from disability services. Id. at 553. Still, she described being overwhelmed by the work and a lack of comprehension and eventually dropped out. See id. at 554-56. Nevertheless, she indicated that she planned on returning to college the next semester. See id. at 554. Plaintiff reported that she aspired to graduate from college with a degree in psychology and to become a psychologist. Id. at 579. Plaintiff stated that she had no prior work history or vocational training. AR at 558-60.

Plaintiff reported that she experienced physical difficulties at school also. AR at 556. She described walking from class to class as "hard." Id. She said that she was limited in high school physical education and never had to do many of the exercises performed by other students because of her condition. Id. at 583.

Plaintiff testified that she had numerous difficulties and had ongoing pain. She identified

problems in her legs, back and ears. AR at 561. She said that she could not swim because of ear problems. Id. at 561-62. She reported that she wore a hearing aid in her right ear because of continual fluid in that ear. Id. at 562. For her earaches, Plaintiff stated that she used eardrops and medication to alleviate the pain. Id. at 564.

Plaintiff reported that she could not walk the length of the entire mall because of her painful legs. Id. at 561-62. She stated that she went to the mall only when she needed something in particular because it was hard for her to walk for very long. Id. at 571. She said that she experienced pain after walking or standing for about ten minutes but believed that she could sit in a chair without difficulty. Id. at 581. Plaintiff stated that the pain in her legs felt like growing pains. AR at 580. She characterized the pain as throbbing, and stated that she experienced it often. Id. She stated that she experienced pain in the middle of her back, around the spine and above the belt line. Id. at 582. She stated that her doctor prescribed ibuprofen for her back pain. Id. at 583.

Plaintiff did not believe that she could work, noting that she had difficulty around the house, even with help from family members. See AR at 560. For example, she testified that she called her mom or brothers when she could not reach items in the kitchen and that she used the lower cupboards to store dishes. Id. at 566. She stated that she used a 12- to 14-inch stool at home to reach things that were higher up also. Id. Still, she noted that the stool was often not tall enough to permit her to reach many things. Id. Plaintiff testified that although she did not cook, she washed dishes but could not put them away. AR at 567-68. She stated that she was unable to do laundry because she could not reach to get the clothes out. Id. at 568. Plaintiff estimated that she could lift no more than ten pounds. AR at 583-84.

Plaintiff stated that she had not learned to drive. AR at 568. She believed that if she learned to drive, she would need a car with special modifications to the steering wheel and pedal extensions. Id. at 569. At the current time, Plaintiff stated that she relied on her mother or other family members to drive her places. Id. at 570.

Plaintiff testified that, for the most part, her typical day revolved around watching television. AR at 584. She reported that she saw friends occasionally and sometimes went to the movie theater. AR at 570. Plaintiff stated that her best friend was a young woman named Crystal, whom she met in

junior high. Id. at 573-74. She recounted that they saw each other occasionally but talked on the phone mostly. Id. at 574. She said that she attended a Fourth of July barbecue at her family's house, AR at 584, and that her cousin did her nails and hair, either at her cousin's house or at the beauty shop where she worked. AR at 571-73. She stated that one of her hobbies was scrap-booking. Id. at 585. Plaintiff testified also that she had an email account through the college that she attended, and liked to look things up on the Internet. AR at 574-75.

Medical Record

Dr. Cynthia Curry examined Plaintiff in May 1988 and again in May 1990. On both occasions, Dr. Curry reported similar findings. AR at 379-83. She found small pectus excavatum in Plaintiff's Thorax/Heart. Id. at 379. She noted a mild lordosis with absence of a lumbar gibbus in Plaintiff's back. Id. In addition, Dr. Curry noted tibial bowing with significant genu recurvatum with restrictive range of motion in Plaintiff's elbows, a condition that she characterized as typical of achondroplasia (dwarfism). See id.

Plaintiff consulted Dr. Marvin Beil, an ear, nose and throat specialist, between April 1991 and June 1995. Dr. Beil treated Plaintiff for several ear problems. In 1991, he reported that Plaintiff had possible fluid behind both tympanic membranes. AR at 429. Also he noted that tubes had been placed in both ears about a year before but found that only the tube in the right ear was still in place. Id.

In December 1992, Dr. Beil treated Plaintiff for recurrent otitis media with conductive hearing loss. Id. at 427. He documented removing a heavy, thick, tenacious fluid from both ears and placed cotton adrenaline pledgets against both tympanic membranes. Id. At the end of the procedure, he removed the pledgets and put T-tubes in place. Id. In June 1995, Dr. Beil noted opacification of the bilateral mastoid air cells consistent with mastoiditis. Id. at 419. Also, he reported mucosal thickening and opacification of the right half of the sphenoid sinus consistent with sinusitis. Id.

Dr. Larry Miller examined Plaintiff in May 1997. Dr. Miller noted that Plaintiff could hear and understand normal conversational speech and he detected no obvious speech deficits. AR at 432. He reported classical achondroplastic findings in her extremities. Id. He characterized

Plaintiff's intellectual performance as quite excellent, noting that her mother indicated that she was at the top of her class. Id. Dr. Miller concluded that from a physical standpoint, Plaintiff was limited in certain aspects of her daily life because of her dwarfism. Id.

In May 1997, Sandra Estrada, a clinical audiologist, examined Plaintiff. Ms. Estrada noted that Plaintiff suffered from a hearing sensitivity, within normal limits, for the right ear, with a moderate drop at 12000 Hz only. AR at 434. She found a mild low frequency hearing loss in the left ear, with normal responses at 1000 through 8000 Hz, but with a moderate drop at 12000 Hz. Id. She determined that Plaintiff had excellent word discrimination results for both ears in a quiet listening environment at conversational speech levels. Id. at 434-35.

On June 20, 1997, Dr. E. Ronn Heiner of Clovis Community Hospital and Medical Center examined Plaintiff. Dr. Heiner noted that Plaintiff had a significant pyogenic granulation response around a retained tube in the right ear. Id. at 442. Also, Dr. Heiner noted that Plaintiff suffered from adhesive otitis media with retraction of the eardrum in the left posterosuperior quadrant with crusting and suspect erosion or early cholesteatoma formation on the left ear. Id. Dr. Heiner performed surgery that day to remove the retained tube and pyogenic granulomata in the right ear and to remove the cholesteatoma in the left ear. Id. at 445.

Dr. James A. Nowlan examined Plaintiff in March 2004. He noted some limits in all range of motion of the hips secondary to obesity. AR at 478. Despite Plaintiff's obesity, Dr. Nowlan noted no tenderness or visible changes in any joints. Id. at 477, 479. He recorded Plaintiff's motor strength as 5/5 throughout the bilateral upper and lower extremities. Id. at 479.

Dr. Nowlan believed that Plaintiff could stand and/or walk for eight hours in an eight-hour workday and sit without restriction. AR at 479. He believed that Plaintiff did not need to use any medically assistive devices. Id. He believed that Plaintiff could lift and carry twenty-five pounds occasionally and ten pounds frequently. Id. However, he stated that he had difficulty estimating how much weight a person of her small size could handle normally. Id. Finally, he found no postural or manipulative limitations beyond the limitations caused by Plaintiff's short stature. Id. at 479-80.

Dr. Jagdev Singh examined Plaintiff in March 2004. He determined that Plaintiff suffered

from a slight infection in her left ear from her previously operated mastoid cavity. AR at 482. He treated this condition with ear drops. Id.

Dr. James V. Glaser, a non-examining agency consultant, completed a physical Residual Functional Capacity ("RFC") assessment in April 2004. In an accompanying "Continuation Sheet," Dr. Glaser noted that Plaintiff was allowed benefits as a child for a growth impairment, but observed that growth impairments did not generally convert into adult listings unless there was a major dysfunction or spine disorder. AR at 493. He described her mobility as good and found no joint deformities. Id. Dr. Glaser believed a light RFC was appropriate.[2] Id.

Dr. Brian Ginsburg, another non-examining agency consultant, completed a physical RFC assessment in July 2004. In an accompanying "Continuation Sheet," he concluded that Plaintiff had some physical limitations, which he characterized as exertional only. AR at 502. Concerning Plaintiff's functional capacity, he cited his RFC finding.[3] AR at 502.

ALJ Findings

As an initial matter, the ALJ determined that Plaintiff attained age 18 on October 9, 2003, and was eligible for SSI benefits as a child for the month preceding the month in which she attained the age of 18. AR at 18. In addition, he determined that Plaintiff was notified that she was no longer disabled as of April 1, 2004, based on a redetermination of disability under the rules for adults who file new applications. Id. Then the ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation. The ALJ noted that the first step in the five-step evaluation is not used when redetermining disability at age 18. Id. at 17. At step two, the ALJ found that Plaintiff' had a medically severe impairment (achondroplasia). Id. at 18. However, in the third step of the evaluation, he determined that this impairment, or a combination of impairments, did not meet or exceed the level required under Agency guidelines for presumed disability. Id.

---

[2] In his RFC finding, Dr. Glaser concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, sit/stand/walk six hours in an eight-hour day each, with no push/pull limitations. AR at 485. In addition, he determined she had no nonexertional limitations. Id. at 486-88.

[3] Like Dr. Glaser, Dr. Ginsburg believed that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, sit/stand/walk for six hours in an eight-hour day each, with no push and/or pull restrictions. AR at 495. He found no nonexertional limitations. Id. at 496-98.

In the fourth step of his analysis, the ALJ determined that Plaintiff had the RFC to perform a restricted range of light work, with a limited ability to reach in all directions, including overhead. AR at 18. He noted that Plaintiff had no past work experience. Id. However, at step five, the ALJ concluded that considering Plaintiff's age, education, and RFC, she was capable of performing a significant number of jobs in the national economy, and therefore, she was not disabled. Id. at 22.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See* Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden

is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[4] Plaintiff challenges the ALJ's determination at step five of the sequential evaluation process, where an individual's ability to perform other work is assessed based on her RFC. Plaintiff raises one claim of error. She alleges that, given the ALJ's RFC assessment "for a restricted range of light exertional work with limited ability to reach in all directions including overhead," there was not substantial evidence to support the ALJ's decision that she was not disabled . In particular, she argues that the ALJ's reliance on Medical-Vocational Rule 202.20 without consulting a vocational expert ("VE") was error.

**DISCUSSION**

1. In light of his RFC assessment, the ALJ's failure to obtain testimony from a VE concerning the availability of jobs Plaintiff could perform was error

At step five of the sequential evaluation, it is the Defendant's burden to show that Plaintiff could perform other work existing in significant numbers in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). Defendant may meet this burden, in certain circumstances, by relying on the medical-vocational guidelines, which allows the ALJ to take administrative notice of the existence of jobs for persons with specified limitations. Id. at 1101.

> The Guidelines present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant. These tables are commonly known as "the grids" The grids categorize jobs by their physical-exertional requirements and consist of three separate tables - one for each category: "maximum sustained work capacity limited to sedentary work," "maximum sustained work capacity limited to light work," and "maximum sustained work capacity limited to medium work." [Footnote]20 C.F.R. pt. 404, subpt. P, app. 2, rule 200.00. Each grid presents various combinations of factors relevant to a claimant's ability to find work. The factors in the grids are the claimant's age, education, and work experience. For each combination of these factors, e.g., fifty years old, limited education, and unskilled work experience, the grids direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements.

[4] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

Id. When the grids apply, they "direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled." Heckler v. Campbell, 461 U.S. 458, 461-462. "When the grids do not match the claimant's qualifications, the ALJ can either (1) use the grids as a framework and make a determination of what work exists that the claimant can perform, see Soc. Sec. Ruling 83-14, 1983 WL 31254 (S.S.A.), or (2) rely on a vocational expert when the claimant has significant non-exertional limitations." Hoopai v. Astrue, 499 F.3d 1071,1075 (9th Cir. 2007).

"The ALJ can use the grids without VE testimony when a non-exertional limitation is alleged because the grids 'provide for the evaluation of claimants asserting both exertional and non-exertional limitations.'" Hoopai, at1075, quoting Razey v. Heckler, 785 F.2d 1426, 1430 (9th Cir. 1986). However, "[t]he ALJ may rely on the grids alone only when they accurately and completely reflect a claimant's abilities and limitations." Tackett at 1102. If a nonexertional limitation significantly limits Plaintiff's abilities in ways that the grids do not contemplate, mechanical application of the grids is inappropriate. Tackett, 180 F.3d at 1102. Unless there is other reliable evidence of a claimant's ability to perform specific jobs, the ALJ must obtain testimony from a VE to determine whether there is other work that Plaintiff can do. Id.

Plaintiff does not dispute that the ALJ's application of § 202.20 of the medical-vocational guidelines to find her not disabled was appropriate if a person of her age, education and "severe medically determinable impairment" would be capable of performing a full range of light work. (See Doc. 17 at 10-11). However, she asserts that because the ALJ determined that she could not perform a full range of light work and had a nonexertional limitation, using the grids without seeking the testimony of a VE was error. (Id. at 11).

As noted, the ALJ concluded that Plaintiff had the severe impairment of achondroplasia (dwarfism). AR at 18. In addition, he concluded that Plaintiff retained the ability to perform only "a restricted range of light work" and had a non-exertional limitation for reaching "in all directions including overhead." Id. In light of these findings and because he failed to discuss the significance

of Plaintiff's reaching limitation,[5] the Court concludes that the ALJ erred in finding that Plaintiff could perform work without obtaining VE testimony concerning the availability of specific jobs.

Defendant argues that because he relied upon the grids, the ALJ had no obligation to identify the specific jobs that he found that Plaintiff could perform. However, the ALJ is relieved of this obligation *only* where he is authorized to rely upon the grids alone without other reliable evidence of the specific jobs that Plaintiff could do *or* he obtains a VE's testimony. Odle v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983). That situation is not present here.

Case law supports this conclusion. In Covarrubias v. Astrue, 2009 WL 4810176 (C.D. Cal., Dec. 8, 2009), the court stated that where "there is evidence that plaintiff has non-exertional limitations, before applying a grids analysis '[t]he ALJ should [have] first determine[d] if [plaintiff's] non-exertional limitations significantly limit the range of work permitted by his exertional limitations.'" Id. at *9. The court held that because the ALJ "failed to substantively discuss plaintiff's non-exertional limitations, let alone [discuss] whether these limitations *significantly* impact plaintiff's ability to work and did not address whether a vocational expert's testimony was needed in this case . . . the Court cannot find that it was appropriate to use the grids, rather than a vocational expert's testimony, to determine if plaintiff is disabled." Id. The court directed a remand to determine if VE testimony was necessary. Id.

Likewise, the court's decision in Thomas v. Barnhart, 278 F.3d 947 (9th Cir. 2002) is instructive. In that case, the plaintiff contended that "because the ALJ found that she 'could perform less [than] a full range of light work,' he erred by not addressing how severely the number of light jobs were reduced due to Ms. Thomas' limitations." Id. The court noted, that when the grids "do not adequately take into account [a] claimant's abilities and limitations, [they] are to be used only as a *framework, and a vocational expert must be consulted*."[6] Id. (Emphasis added). Because the ALJ

---

[5] Soc. Sec. Ruling ("SSR") 85-15 states that reaching (extending the arms and hands in any direction) and handling are activities required in almost all jobs; significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could other wise do. Id. at 7.

[6] In this case, the ALJ acknowledged that because Plaintiff could not perform "substantially all the exertional demands" of light work and/or had a nonexertional limitation (reaching) the medical-vocational grids could be used only as a *framework*. AR at 22. Thomas indicates that under these conditions, a VE "must be consulted." See 278 F.3d at

consulted a VE and received testimony that the plaintiff retained the ability to perform certain jobs despite her limitations, the court concluded that the ALJ's use of the grids in finding that she was not disabled was appropriate. Id.

Therefore, in light of the ALJ's determination that Plaintiff could perform less than a full range of light work with a nonexertional limitation and given the lack of other reliable evidence of Plaintiff's ability to perform specific jobs, the ALJ erred in concluding that Plaintiff was not disabled without obtaining testimony from a VE.

2. Remand is appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate repayment of benefits is within the discretion of the district court. Harman v. Apfel, 211 F.3 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation. Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v. Ventura, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1399 (9th Cir. 1988).

Because the issue addressed in this order requires further clarification, and because it is not clear that an award of benefits to Plaintiff should result after these issues are addressed, the Court will order the matter remanded.[7] McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989) (the decision to remand for further proceedings or simply award benefits is within the discretion of the court).

///

///

///

///

---

960.

[7] Plaintiff agrees that remand for further consideration by the Commissioner is appropriate. (Doc. 17 at 12).

**CONCLUSION**

Based on the foregoing, this case is HEREBY REMANDED to the Secretary pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this decision. The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

Dated: **July 29, 2010**

**/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE